No. 18            September 23, 2015            175

IN THE OREGON TAX COURT
REGULAR DIVISION

Earle M. CHILES,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant,*
*and*

MULTNOMAH COUNTY ASSESSOR,
*Defendant-Intervenor.*

(TC 5232)

Plaintiff (taxpayer) appealed from a decision of the Magistrate Division as to the real market value (RMV) of a condominium unit located in Portland, Oregon. Following trial the court found that taxpayer had met its burden of proof with respect to the comparable sales used to establish RMV, but that various adjustments made to taxpayer's comparable sales data were not based upon a reliable source (specifically, a definition from an online encyclopedia) and therefore were without merit and were to be dispensed with. The court directed that the parties were to confer on a final value, employing the parameters described in its opinion.

Trial was held March 16, 2015, in the Multnomah County Courthouse, Portland.

Cynthia M. Fraser, Garvey Schubert Barer PC, Portland, argued the cause for Plaintiff (taxpayer).

Lindsay R. Kandra, Multnomah County Counsel, Portland, argued the cause for Defendant-Intervenor Multnomah County Assessor (the county).

Decision rendered September 23, 2015.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This property tax case presents the question of the real market value (RMV) of a condominium unit located in Portland, Oregon. The tax years at issue are 2011-12 and 2012-13.

## II.   FACTS

The subject property is a condominium unit located in the Fountain Plaza Condominium project (the Project) in the KOIN tower (the Tower) in downtown Portland. The first 19 floors of the Tower are used as retail and office space. The Project occupies floors 20 through 30 of the Tower. The subject property is located on the 30th floor. The 31st floor is used for storage, and the space above that floor houses radio and television equipment.

The subject property is 3,812 square feet and has three bedrooms and two and one-half bathrooms. It was built in 1985 and is located in the Downtown district of Portland. Its style and finishes are mostly original, although some areas have been renovated. The subject property has two outside decks and good views.

## III.   ISSUE

The issue in this case is the RMV of the subject property for the years at issue.

## IV.   ANALYSIS

### A.   *Comparable Sales*

Both the appraiser for Intervenor-Defendant (the county) and the appraiser for Plaintiff (taxpayer) used the comparable sales method to value the subject property.

For the 2011-12 tax year, the appraiser for taxpayer used as comparable sales two condominium units in the John Ross building in the South Waterfront area. For his third comparable sale for that year he used a unit in the Elliot Tower in the Downtown district. He found these units to be the most comparable in location to the subject property.

For 2011-12, the appraiser for the county used three units in Northwest Portland, two in the Nob Hill district, and one in the Pearl district. He did not use sales of units in the John Ross building because they were sales made at auction.

For 2012-13, the appraiser for taxpayer again used the two John Ross units and used as his third comparable sale a condominium unit in the Nob Hill district.

For 2012-13, the appraiser for the county again used the two Nob Hill district units and used as his third comparable sale a unit in the Pearl district.

Taxpayer's witness Sasha Welford, a real estate agent familiar with the condominium units used as comparable sales by taxpayer and the county, testified that condominium units in the Nob Hill and Pearl districts were much more desirable than those in the Downtown and South Waterfront districts. In her opinion, the locations of the units chosen by the county had many more amenities and were in much more desirable locations than the subject property. The South Waterfront and Downtown district locations chosen by the appraiser for taxpayer were, in her opinion, much more comparable to the subject property than the units in the Nob Hill and Pearl districts. The units in the South Waterfront and Downtown districts were isolated and not in close proximity to shopping and restaurants, similar to the subject property. The appraiser for taxpayer agreed with Welford's assessment of the locations and amenities of the comparables used by the parties.

The appraiser for the county initially contended that the Nob Hill and Pearl districts were similar to the Downtown district. However, he ultimately conceded that the Pearl district was more attractive to a greater number of people than the Downtown district.

The court finds the testimony of Sasha Welford and the appraiser for taxpayer as to the comparability of the locations of the units chosen as comparable sales to be persuasive. The court therefore finds that taxpayer met its burden of proof with respect to the comparable sales used to establish RMV.[1]

---

[1] That the John Ross units were sold at auction does not of itself change the analysis. As the county states, this court has "indicated that it believes purchase at auction, in itself, is not determinative of whether the property was purchased at market value." Indeed, distress sales can provide the most accurate reflection of market value, such as where the majority of sales in a given market are made in distress. *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985). The county asserts that details of the auction would be necessary to make a determination of value, but it cites no authority for that proposition. The court is not aware of any threshold level of detail that must be provided with respect to sales at auction.

That determination, however, does not end the matter. The court will next discuss the various adjustments made to taxpayer's comparable sales.

B.  *Adjustments to Taxpayer's Comparable Sales Based on "Penthouse" Status*

The appraiser for taxpayer made adjustments to some of his comparable sales because those units were "penthouses" and the subject property, in his opinion, was not a penthouse because it was not located on the top floor. He based this assessment on information not obtained from reliable sources used in the appraisal industry, but on an entry in Wikipedia. The entry as cited by the appraiser for taxpayer reads, in relevant part:

> "A penthouse apartment or penthouse is an apartment on the highest floor of an apartment building. Penthouses are typically differentiated from other apartments by luxury features. The term penthouse originally referred to, and sometimes still does refer to, a separate smaller 'house' that was constructed on the roof of an apartment building."

As an initial matter, the court does not find particularly authoritative an entry in Wikipedia. The appraiser for taxpayer testified that he did not know how Wikipedia entries are made. As Wikipedia's "About" page indicates, the website is user-generated, largely by anonymous users:

> "Wikipedia is written collaboratively by largely anonymous volunteers who write without pay. Anyone with Internet access can write and make changes to Wikipedia articles, except in limited cases where editing is restricted to prevent disruption or vandalism. Users can contribute anonymously, under a pseudonym, or, if they choose to, with their real identity."

*Wikipedia:About*, https://en.wikipedia.org/wiki/Wikipedia: About (last accessed Sep 8, 2015, 1:46 PM). Furthermore, even if the court were to accept the definition from Wikipedia to be authoritative, the entry itself provides that bottom floor units can be considered penthouses: "[a penthouse] can be also located on the bottom floor with a built in garage." *Wikipedia*, https://en.wikipedia.org/wiki/Penthouse_apartment (last accessed Sep 8, 2015). This additional

definition can be found in the middle of the block quote cited by taxpayer's appraiser.[2] Thus, taxpayer's own source refutes the idea that a penthouse must be on the top floor.

As the county pointed out at trial, a competing online source, Wiktionary, defines penthouse as "[a]n apartment or suite found on an upper floor, or floors, of a tall building, especially one that is expensive or luxurious with panoramic views. Sometimes these are located just under 'penthouse mechanical' floors." *Wiktionary*, https://en.wiktionary.org/wiki/penthouse (last accessed Sep 8, 2015, 1:54 PM).

Taxpayer's appraiser stated that he independently performed a "penthouse extraction" to show the difference in sales price between units that constituted penthouses and those that did not. However, without a reliable source for determining whether the subject property was in fact a penthouse or not, the court finds that data to be irrelevant.

The court finds that taxpayer's penthouse adjustments are without merit. Thus, the comparable sales used by taxpayer will be used without adjustment for penthouse status.

C.  *Floor Location Adjustments*

Both parties agree as to the proper floor location adjustments to be made for tax year 2011-12. Indeed, taxpayer's appraiser used the county's paired sales analysis to determine the adjustment. Taxpayer used the figure of $10,000 per floor for both 2011-12 and 2012-13, whereas the county used the figure of $10,000 per floor for 2011-12 and $10,864 per floor for 2012-13. As the appraiser for taxpayer did not perform his own floor location adjustment for either year, the court finds that the county's figures should be used. Thus, the court finds that the $10,000 per-floor adjustment taxpayer's appraiser used for 2011-12 is proper, and taxpayer's comparables sales should use a $10,864 floor location adjustment for the 2012-13 tax year.

---

[2] This leads the court to believe that either the appraiser conveniently omitted this part of the definition without indicating that he was doing so, or that the entry was changed after he cited it. If the latter, this fact would further support the court's conclusion that this source was not a reliable one to consult for the definition of the word penthouse.

The county in its closing brief takes issue with the floor location adjustment made to taxpayer's Comparable 8 for the 2012-13 tax year, noting that it does not reflect a $10,000 per-floor adjustment. First, the county did not specifically take issue with this adjustment at trial, and thus it appears that it first raises this objection in its closing brief. Second, the appraisal notes that Comparable 8, although a third-level unit, had a similar elevation as the subject property by virtue of its location on a hill. The court notes that if a $10,000 per-floor figure had been used, that adjustment would have been $270,000, and the adjustment actually made was $135,000, or half of that number. While the appraisal does not discuss this discrepancy, the court finds that there was sufficient information in the record to infer that the appraiser used half the floor location adjustment because of the similarity in elevation. The court finds that the apparent use by taxpayer's appraiser of half the location adjustment was not improper.

However, because the court has found that taxpayer's appraiser should have used a $10,864 per-floor adjustment for the 2012-13 tax year, the court finds that the adjustment should be increased commensurately, such that the floor location adjustment for Comparable 8 should be $146,664.

D.   *Fireplace Adjustments*

Taxpayer's appraiser conceded at trial that the fireplace adjustment of $250 made to Comparable Sale 8 for the 2012-13 tax year should have been $2,500. The court finds that the adjustment should be $2,500.

E.   *Gross Living Area Adjustments*

The county in its closing brief questions why the appraiser for taxpayer did not use different gross living area (GLA) adjustments for the tax years at issue. In its view, the testimony of the appraiser for taxpayer that "there were changes in the market" between the two years indicates that the GLA should have differed. However, both appraisers used an adjustment of $200 per-square-foot for each of the years at issue. Thus, the court finds that the use by taxpayer's appraiser of $200 per-square-foot was not improper.

F.   *Parking Space Adjustments*

The county also takes issue with the use by taxpayer's appraiser of a $15,000 per-parking-space adjustment, because, according to the county, taxpayer's appraiser did not substantiate this figure with any data. While taxpayer's appraiser cites no specific source in support of its figure, the court notes that the county's own appraiser used an even higher figure—$25,000 per parking space. The court finds that the use by taxpayer's appraiser of a figure more conservative than that used by the county to be appropriate and not improper in this case.

G.   *Weighting of Comparables*

The county did not call into question the weighting used by taxpayer's appraiser of the comparable sales used. As for 2011-12, the court finds the weighting selected by the appraiser for taxpayer to be proper.

The county noted that taxpayer's appraiser incorrectly calculated the RMV as purportedly weighted, reaching a $1,200,000 conclusion of value for 2011-12 as opposed to a $1,305,700 conclusion of value. The court finds that the county is correct, and the RMV should be calculated using the actual weighted percentages (25 percent to Comparable 4, 50 percent to Comparable 5, and 25 percent to Comparable 6), after accounting for the adjustments to be made as detailed above.

H.   *Other Issues*

The county argues that, because taxpayer's appraiser listed in the "extraordinary assumptions" section of his appraisal the assumption of a fact regarding the average age of residents of the Project, this violates an appraisal ethics rule and thus makes his appraisal "ethically suspect." However, taxpayer's appraiser stated at trial that he did not rely on this assumption in his appraisal. The court finds that the listing of this assumption in the appraisal is not fatal to the court's use of taxpayer's appraisal.

The county alleged that the appraiser for taxpayer violated other appraisal ethics rules by: (1) failing to mention earlier appraisals of the subject property in his appraisal;

(2) including data for the tax year 2010-11, which was outside the scope of the tax years at issue; and (3) using the label "restricted appraisal report" erroneously. The court finds that none of these alleged errors affect the reliability of the pertinent information in the appraisal. Other minor typographical and mathematical errors were addressed and corrected at trial.

Any additional adjustments not specifically discussed above will be made as calculated by the appraiser for taxpayer.

## V.  CONCLUSION

The court finds that the comparable sales used by the appraiser for taxpayer are more comparable than those used by the appraiser for the county. The adjustments made by the appraiser for taxpayer are proper except where specifically found otherwise as detailed above.

The parties are directed to confer on a final value taking into account this opinion.  If the parties have unresolved differences there will be a further hearing. Now, therefore,

IT IS THE DECISION OF THIS COURT that the RMV of the subject property is to be calculated as detailed above.

IT IS FURTHER DECIDED that the parties shall confer on a final value as directed above.